UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH SAMPLE,

          Plaintiff,

     v.

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC, et al.,

          Defendants.

Case No. 23-cv-00428-WHO

**ORDER ON THE MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 121, 131

Plaintiff Joseph Sample brings this harassment and discrimination lawsuit against Cemex Construction Materials Pacific, LLC ("Cemex") and individual Cemex employees (altogether, "defendants"). Before me now are two motions for summary judgment. One, brought by the individual defendants who worked in Human Resources and management, I GRANT in full. I agree with them that there are no material factual disputes—the individual defendants' alleged conduct does not rise to the level of severe harassment. The other, brought by Cemex alone, I GRANT IN PART. After-acquired evidence establishes that Mr. Sample did not disclose evidence of his mental health issues when being certified for his job as a ready-mix driver in accordance with the mandates of the Department of Transportation, requiring his dismissal. His termination-related claims fail as a result. There are substantial factual disputes over his harassment and hostile work environment claims against Cemex, so causes of action related to its liability for conduct while Mr. Sample was employed will survive.

## BACKGROUND

### I.     Factual Background

Cemex is a building materials company that supplies concrete and building materials worldwide. Fourth Amended Complaint ("4AC") [Dkt. No. 105] ¶ 10. At all times relevant to Mr. Sample's complaint, Cemex employed individual defendants Joanna Pine as a Human

Resources Business Partner and a Human Resources Director, Kimberly Linton as a Human Resources Specialist and Human Resources Business Partner, and Demetrius Hawkins as a Plant Manager. 4AC ¶¶ 3–5; Answer to the Fourth Amended Complaint ("Answer") [Dkt. No. 110] ¶¶ 3–5.

Mr. Sample is a disabled African American man who was born with congenital brain malformations. 4AC ¶ 11. These abnormalities resulted in a number of physical and intellectual manifestations, including speech impairment, diminished hearing ability, unusual gait, and intellectual disabilities. 4AC ¶¶ 13, 16. Despite varied hardships growing up as a result of his differences, he worked several jobs as an adult, primarily at his family's restaurant. 4AC ¶ 12.

Mr. Sample was hired at the Antioch, CA, location of Cemex as a ready-mix driver on August 2, 2017. 4AC ¶ 13. Although he failed the probationary period and lost that job temporarily, he was rehired on May 15, 2018, and passed his second probationary period. 4AC ¶ 14; Answer ¶ 14. After being permanently hired, Mr. Sample alleges that he rarely missed work and frequently volunteered to work fourteen-hour or sixteen-hour shifts at Cemex. 4AC ¶ 15.

Mr. Sample asserts that he experienced discriminatory and harassing behavior from his co-workers, Cemex managers, and Human Resources representatives, including the individual defendants named in this case, due to his race and his disabilities. He alleges that employees regularly referred to him as "retarded," or as "the retard" at work. Sample Decl. [Dkt. No. 141-2] at ¶ 13. Cemex employees also made disparaging comments towards Mr. Sample like "he's slow," called him a "dummy," or stated that "there is something wrong with him," and that "he talks funny" in reference to the visible manifestations of his disabilities. *Id.* Mr. Sample also endured negative comments referring to his race. Co-workers and supervisors used the "N-word" to refer to Mr. Sample. *Id.* He was called derogatory terms, including "jungle bunny," "catfish," and "monkey." *Id.* And, on least one occasion, a co-worker placed a drawing of a noose in the break room to scare Mr. Sample. *Id.*

Mr. Sample filed grievances with his union in February 2022 and July 2024 and complained to his Cemex Plant Manager Demetrius Hawkins in July 2022 about the race and disability-based name calling. *See* Exh. 24 [Dkt. No. 141-4] at 19–20; Exh. 30 [Dkt. No. 141-4]

United States District Court
Northern District of California

at 45–47; Exh. 36 [Dkt. No. 141-5] at 5–8.  One of Mr. Sample's former coworkers, Thomas Milano, also lodged a complaint to Cemex's human resources department concerning Mr. Sample's treatment.  Milano Decl. Exh. 8 [Dkt. No. 141-3] at 105 ¶ 5.  According to Mr. Sample and Mr. Milano, the issues raised in their complaints were never investigated.  *Id.*; Sample Decl. [Dkt. No. 141-2] at ¶ 19.

Cemex has an internal complaint procedure that "appl[ies] to any employee who believes he or she has been the subject of inappropriate conduct, discrimination, threats of (or actual) violence, insulting, degrading or exploitative treatment, or other conduct in violation of CEMEX, Inc. policies . . . ."  Cemex HR Complaint Procedures [Dkt. No. 141-3] at 100.  The procedure involves a three-step process, based on the individual needs of a complainant.  *Id.*  The first step, Cemex's "Open Door Policy," intends that "[m]ost issues can and should be resolved informally between the employee and his or her manager through direct communication and understanding."  *Id.*  The second step involves filing a complaint along with an ensuing investigation.  *Id.*  This allows for a Cemex employee to meet directly with a Human Resources representative or call an "Employee Hotline" that is available 24/7.  *Id.* at 101.  Finally, step three provides for an appeal process wherein the Executive Vice President of Cemex's Human Resources can further investigate an issue to provide a "final determination."  *Id.*

Cemex denies that any Human Resources employee ever made a disparaging comment about Mr. Sample due to his race or disability.  It further disputes that it was ever made aware of Mr. Sample's allegations of discrimination or harassment until this lawsuit was filed.  Mr. Sample never utilized the internal complaint hotline and never made the union grievances directly available to Cemex.  Cemex Motion for Summary Judgment ("MSJ 2") [Dkt. No. 121] at 14–15, 27; Reply in Support of MSJ 2 ("Reply MSJ 2") [Dkt. No. 143] at 8, 12–13 ("[Mr. Sample] admittedly never gave [Cemex] the opportunity to investigate, address, and prevent the alleged conduct he now claims existed at the local level"); Pine Depo. [Dkt. No. 143-1] at 16 ("Q: And as you sit here today, your testimony is that you did not receive this grievance and nobody within the human resources department received this grievance? A: No.").  It further contends that Mr. Sample's complaint to Mr. Hawkins "was not a complaint of harassment based on disability or

race." Reply MSJ 2 at 8. It says that Mr. Sample's complaint of harassment to Mr. Hawkins was a response to learning that other employees felt unsafe working with him. *Id.*

The parties also dispute the quality of Mr. Sample's job performance. Mr. Sample was involved in several driving incidents while working for Cemex. In his view, the consequences of these incidents are evidence of Cemex's retaliatory actions against him for filing complaints, including the instant lawsuit, and are best seen as harassing actions because of his race and disability. From Cemex's perspective, however, these incidents are evidence of Mr. Sample's inadequate job performance and ultimately support its decision to terminate him.

The first of these incidents occurred in December 2019, when Mr. Sample allegedly backed up a ready-mix truck onto the chutes of another Cemex vehicle and failed to report the incident. *See* [Dkt. No.141-3] at 115, 121. He was terminated, although Cemex policy states that "[i]f an employee fails to report" such an incident, the disciplinary action for the first offense is not termination but a three-day suspension without pay. [Dkt. No. 141-3] at 119. Mr. Sample appealed the termination through the union and was reinstated on January 19, 2020, but he was made to serve a three-week disciplinary suspension. Sample Decl. [Dkt. No. 141-2] at ¶ 16. In his appeal documents, Mr. Sample made it clear that he wished for "all driver[s]" to be disciplined "fairly." [Dkt. No. 141-3] at 124.

A second incident occurred in early January 2022, when two Cemex drivers allegedly falsely reported Mr. Sample to the California Department of Motor Vehicles as an "unfit driver," resulting in the temporary suspension of Mr. Sample's commercial driver's license as well as his subsequent inability to work. Sample Decl. [Dkt. No. 141-2] at ¶ 18; Sample Depo. [Dkt. No. 141-4] at 17. His license was eventually reinstated and Mr. Sample was able to return to work on February 25, 2022, but no investigation into the alleged false-reporting Cemex drivers occurred, according to Mr. Sample. Sample Depo. [Dkt. No. 141-4] at 17.

Another incident occurred in March 2022 when Mr. Sample was involved in a traffic accident while driving his ready-mix vehicle. Sample Decl. [Dkt. No. 141-2] at ¶ 20. Mr. Sample believed that he went through a yellow light and collided with another driver, resulting in only minor property damage. *Id.* Although the related police report noted that the officer could not

determine fault, Mr. Hawkins determined that Mr. Sample was to blame (according to Mr. Sample, without the police report having ever been made available).  March 2022 Police Report [Dkt. No. 141-4] at 29; Hawkins Depo. [Dkt. No. 141-4] at 37–38.  Cemex again terminated Mr. Sample.  Sample Decl. [Dkt. No. 141-2] at ¶ 21.  After appealing his termination to the ACA Board of Adjustment, Mr. Sample was reinstated to his position on May 26, 2022.  [Dkt. No. 141-4] at 42.

For Cemex, these incidents are "overwhelming evidence of [Mr. Sample's] repeated performance issues."  Reply MSJ 2 at 9–10.  During his deposition, Mr. Hawkins said that Mr. Sample "was a good employee.  I mean, he listened whenever we had directions, the safety stuff. He just had a lot of incidents or accidents and work performance issues."  Hawkins Depo. [Dkt. No. 143-1] at 27.

Mr. Sample also took numerous leaves of absence.  The parties dispute whether: (1) the communications between Cemex and Mr. Sample during his leaves of absence constituted harassment or failure to accommodate Mr. Sample's disability; (2) Cemex's communications were attempts to "engage in the interactive process" as is required of a company when disabled employees are seeking lawful accommodations; and (3) these numerous leaves of absence are additional evidence of Mr. Sample's performance issues.

Mr. Sample contends that because of the stressful nature of his daily experiences at work, he requested and received leaves of absences starting in 2022.  He received medical notes approving these leaves of absences either through his medical care provided by Kaiser Permanente Medical Center ("Kaiser") or through a clinic called Disability Counseling Services. At Disability Counseling Services, he primarily saw Disability Specialist and Psychologist Dr. Sandra H. Smith, Ph.D. ("Dr. Smith").

Mr. Sample first took disability leave in a series of leaves of absences from August 4, 2022–May 15, 2023.  Sample Depo. [Dkt. No. 124] at 68–73.[1]  He then took another leave of

---

[1] These leaves were from August 4, 2022–November 4, 2022; November 4, 2022–February 4, 2023; January 24, 2023–April 24, 2023 (Mr. Sample sought a renewed leave before the conclusion of his prior leave); and April 24, 2023–May 15, 2023.  *Id*

United States District Court
Northern District of California

absence from June 26, 2023, to July 31, 2023.  *Id.* at 76; Pine Decl. [Dkt. No. 127] at ¶ 20.  In 2024, Mr. Sample first requested medical leave from January 22, 2024–January 29, 2024.  Sample Depo. [Dkt. No. 124] at 79.  Later in 2024, Kaiser again put Mr. Sample on leave starting with a leave from July 17, 2024–July 31, 2024.  *Id.* at 82.  Afterwards, Dr. Smith of Disability Counseling Services signed a leave of absence slip stating Mr. Sample was unable to work from August 8, 2024–November 8, 2024.  *Id.* at 84–85.

After that leave ended, Mr. Sample did not return to work.  Following several communications from Cemex, which I address further below, Mr. Sample submitted a backdated leave of absence form, seeking an additional leave from November 8, 2024, through February 8, 2025.  *Id.* at 89.  On February 20, 2025, counsel for Mr. Sample sent Cemex a final leave of absence slip on behalf of Mr. Sample from Disability Counseling Services—this time signed by a Dr. Lara San Pedro—dated February 6, 2025, and extending Mr. Sample's medical leave to May 8, 2025.  Sample Decl. [Dkt. No. 141-2] at ¶ 36; San Pedro Note [Dkt. No. 164-9] at 2.

After his July 2024 leave of absence, Cemex Human Resources employees, including Ms. Pine and Ms. Linton, communicated with Mr. Sample via letter, email, and text, requesting additional documentation to support his submitted medical notes stating that he required time away from Cemex.  4AC ¶ 28.  These requests typically sought the following information: "(1) whether he intended to return to work upon the expiration of his leave . . .; (2) whether he had any work restrictions; (3) the nature and expected duration of any such restrictions; and (4) any accommodations he would require."  Linton Decl. [Dkt. No. 128] at ¶ 5; *see, e.g.*, October 14, 2024 Letter Exh. 50 [Dkt. No. 124] at 210.  Mr. Sample provided no additional documents outside of his Kaiser or Disability Counseling Services leave of absence slips.  When Cemex Human Resources representatives texted Mr. Sample directly to follow up, Mr. Sample relied on the previously-submitted doctor notes and stressed his belief that Cemex's continued contact during his medically-supported leave was harassing in nature.  *See* Sample Depo. Exh. 54 [Dkt. No. 124] at 222–24, Linton Depo. Exh. 1 [Dkt. No. 126] at 107–08.

Because Mr. Sample failed to respond to Cemex's request for additional documentation, Cemex sent Mr. Sample recall notices on November 12, 2024, December 17, 2024, and February

6

10, 2025. Linton Decl. [Dkt. No. 128] at ¶¶ 7, 9, 14; Recall Notices, Exhs. 52, 55, 57 [Dkt. No. 124] at 215, 225, 230. These recall notices explained that "additional documentation was needed to support [his] request for leave" and that the existing documents were "insufficient to support [his] request for leave." November 12, 2024 Recall Notice Exh. 52 [Dkt. No. 124] at 215. The notices further informed Mr. Sample that his "ongoing absences [were] now subject to being treated as unexcused," and that "failure to timely successfully complete [the outstanding requirements] [would] be treated as voluntary job abandonment." December 17, 2024 Recall Notice Exh. 55 [Dkt. No. 124] at 225.

On February 12, 2025, Mr. Sample received Cemex's third recall letter noting the possibility of "voluntary job abandonment." He understood that this was a notice of job termination. Sample Decl. [Dkt. No.141-2] at ¶ 36. He suffered a heart attack that he blamed on the stress of receiving Cemex's letters, requiring a hospital stay and the placement of a stent. *Id.*

On February 24, 2025, Cemex officially terminated Mr. Sample. *Id.* Despite that, later in April and May of 2025, Mr. Sample received medical clearance from his therapist, primary care doctor, and Department of Transportation ("DOT") medical examiner Dr. Daryl Berman to return to work starting in May 2025, without the need for any accommodations.[2] *Id.* at ¶ 38.

While Mr. Sample was on leave, Cemex informed him that despite the status of his leave, he was still required to attend a mandatory DOT physical to maintain his certification as a ready-mix driver. Linton Decl. [Dkt. No. 128] at ¶ 8. Cemex scheduled Mr. Sample for an exam on November 12, 2024, and rescheduled the exam for November 25, 2024, at Mr. Sample's request. *Id.* Mr. Sample failed to attend the rescheduled exam. *Id.* According to evidence submitted by Mr. Sample, he had a successful DOT certification exam on May 16, 2024, the results of which had an expiration date of May 16, 2025. Sample Decl. Exh. 43 [Dkt. No. 141-5] at 39–43. He had an additional successful DOT certification exam on May 8, 2025, resulting in a certification expiration date of May 8, 2026. *See* May 8, 2025 Medical Examiner's Report and Certificate

---

[2] At a June 3, 2025, follow-up appointment at Disability Counseling Services, Dr. Smith noted Mr. Sample's return to work date of May 8, 2025, but also stated that he should continue to receive disability benefits due to his current mental state. Smith Depo. Exh. 11 [Dkt. No. 162-1] at 355.

Sample Decl. Exh. 48 [Dkt. No. 141-5] at 62–66.  Both certification exams were conducted by Dr. Berman.

During the course of discovery, Cemex learned that Mr. Sample had withheld information from Dr. Berman during the course of his certification exams.  *See id.*  One portion of the exam requires that Mr. Sample respond to questions about his health history.  *Id.*  For both his 2024 and 2025 health history responses, Mr. Sample responded to the following questions with the answer "No": "Do you have or have you ever had: 1. Head/brain injuries or illnesses (e.g. concussion) . . . 4. Ear and/or hearing problems . . . 14. Anxiety, depression, nervousness, other mental health problems."  Sample Depo. Exh. 43 [Dkt. No. 141-5] at 40; Exh. 48 [Dkt. No. 141-5] at 64.  This is despite Mr. Sample's well-documented experiences with having a congenital brain disorder and hearing loss.  *Compare* 4AC ¶¶ 11 ("[Mr. Sample] has been disabled since birth . . . he was always in special education."), 16 ("When frustrated, his speech might become impaired, and he has some diminished capacity of hearing on the right side.") *and* Oppo. MSJ 2 at 10 ("Mr. Sample is a proud disabled African American man") *with* Sample Depo. [Dkt. No. 124] at 138:18–139:10 ("I never knew that I had brain injury problems.").  Further, neuropsychologist Dr. George Woods, who performed a psychiatric evaluation on Mr. Sample in preparation for this case, stated that "Mr. Sample has . . . been in therapy due to stress and anxiety for years.  His anxiety has reached the level that he has gone to the emergency room beginning in 2022."  Oppo. MSJ 2 Exh. 1 [Dkt. No. 141-3] at 6, 10.  Mr. Sample admits that he was receiving treatment for major anxiety and depression disorder at the time of his 2024 DOT certification examination, which allowed him to collect disability benefits.  Sample Depo. [Dkt. No. 124] at 139–140.

**II.    Procedural History**

Mr. Sample first filed his complaint in this case pro se on January 30, 2023.  *See* Complaint [Dkt. No. 1].  Following a round of motions to dismiss, I referred Mr. Sample to the Federal Pro Bono Project on July 10, 2023.  Dkt. No. 30.  After an additional motion to dismiss and resolving a number of disputes between the parties, I granted Mr. Sample's request to file a fourth amended complaint on May 6, 2025, which he filed on May 12, 2025.  [Dkt. Nos. 104,

United States District Court
Northern District of California

United States District Court
Northern District of California

105]. In that complaint, Mr. Sample alleges ten causes of action against defendants:[3] (1) Racial Discrimination in violation of Cal. Gov. Code §§ 12940(a) (FEHA) and Title VII 42 U.S.C. §§ 2000e, *et seq.*, 4AC ¶¶46–58; (2) Disability Discrimination in violation of FEHA and 42 U.S.C. ¶ 12101, *et seq.* (the ADA), 4AC ¶¶ 59–69; (3) Failure to Provide a Reasonable Accommodation in violation of FEHA and the ADA, 4AC ¶¶70–82; (4) Failure to Engage in the Interactive Process in violation of FEHA and the ADA, 4AC ¶¶ 83–95; (5) Harassment and Hostile Work Environment in violation of FEHA (against all defendants) and Title VII, 42 U.S.C. § 1981 (against Cemex), 4AC ¶¶ 96–107; (6) Retaliation in violation of Title VII, 42 U.S.C. § 1981, the ADA, and FEHA, 4AC ¶¶ 108–119; (7) Retaliation in Violation of Cal. Lab. Code § 1102.5 and SB 497 (Whistle-Blower Statute), 4AC ¶¶ 120–131; (8) Failure to Prevent Discrimination, Harassment, and Retaliation in violation of FEHA, 4AC ¶¶ 132–139; (9) Violation of 42 U.S.C. § 1981, 4AC ¶¶ 140–144; and (10) Wrongful Termination in violation of California public policy, 4AC ¶¶ 145–154. Mr. Sample seeks compensatory, punitive, and statutory damages as well as injunctive and equitable relief. 4AC at 24–25.

On July 30, 2025, the individual defendants moved for summary judgment on Mr. Sample's fifth cause of action. Individual Defendants' Motion for Summary Judgment ("MSJ 1") [Dkt. No. 121]. That same day, Cemex moved for summary judgment on each cause of action raised in Mr. Sample's complaint. Cemex Motion for Summary Judgment ("MSJ 2") [Dkt. No. 131]. Mr. Sample opposed both motions. *See* Oppo. MSJ 1 [Dkt. No. 141]; Oppo. MSJ 2 [Dkt. No. 142]. The defendants replied. *See* Reply MSJ 1 [Dkt. No. 143]; Reply MSJ 2 [Dkt. No. 144]. I held a first hearing on the motions on September 10, 2025. [Dkt. No. 154]. At that hearing and afterwards, additional discovery disputes rooted in evidentiary and deposition issues were raised. I permitted supplemental briefs on the motions, which both parties filed. *See* Defendants' Supplemental Brief ("Def. Supp. Br.") [Dkt. No. 162]; Plaintiff Sur-Reply ("Pl. Sur-Reply") [Dkt. No. 164]. I held a second hearing on the motion on November 19, 2025. [Dkt. No. 169].

---

[3] Each of the causes of action are pleaded against Cemex only, with the exception of the fifth cause of action, which is also pleaded against the individual defendants.

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.      Reliability of the San Pedro Note**

Before the first hearing on the summary judgment motions, the parties filed a number of discovery disputes, emergency motions, and motions to compel. One of these motions, filed by defendants, was a Motion to Amend/Correct the Scheduling Order. *See* Motion to Amend [Dkt. No. 148]. In that motion, defendants argued that "Plaintiff relied on fraudulent medical documents to extend his leave during this litigation." *Id.* at 10 (cleaned up). Defendants asserted that Dr. Lara San Pedro, one of the providers at Disability Counseling Services, never treated Mr. Sample and never provided him with a leave of absence slip, even though a slip bearing her purported signature had been offered as evidence in this case. *Id.*

At the first hearing on the summary judgment motions, counsel for Mr. Sample addressed

and denied the allegations of fraud.  Transcript September 10, 2025 Hearing [Dkt. No. 160] at 5–6.  To clarify the issue, I allowed an additional deposition of Mr. Sample and his wife and for the parties to file supplemental briefing on that and other issues.  Minute Order [Dkt. No. 154].  I also granted Cemex's Motion to Enforce the deposition of Dr. Smith, Mr. Sample's ongoing therapist.  Order Granting Motion to Enforce [Dkt. No. 155].  The parties conducted the additional depositions and filed supplemental briefing, *see* Def. Supp. Br., Pl. Sur-Reply; Cemex additionally moved for sanctions, *see* Motion for Sanctions [Dkt. No. 165].

After a second hearing on the motions, I have concluded that although defendants did not establish that Mr. Sample engaged in any fraudulent behavior, there is no doubt that the San Pedro note itself is unreliable.  Dr. Smith testified that it is common at Disability Counseling Services to use "presigned" leave of absence forms for clinicians to "give tacit consent" so that an "intake person" can hand such forms to patients when they come into the clinic seeking a leave of absence.  Smith Depo. [Dkt. No. 164-5] 49, 55.  This practice is appalling.  But it is clear from Mr. Sample's additional deposition that he had no hand in creating a false document purportedly signed by Dr. San Pedro; he simply went to Disability Counseling Services to pick up a leave of absence form as he was told to do.  Sample Depo. [Dkt. No. 164-3] at 16.  The pre-signed San Pedro note is inadmissible.  Dr. San Pedro says that she never treated Mr. Sample.  However, Dr. Smith testified that *she* had several appointments with Mr. Sample and approved his repeated leaves of absence based on those appointments.

In sum, the San Pedro note is inadmissible, except to attack the professionalism of Disability Counseling Services (if that is relevant).  The parties may rely on other, reliable evidence concerning Mr. Sample's leaves of absence at trial.  The motion for sanctions is DENIED.[4]

---

[4] In their Reply in Support of the Motion for Summary Judgment, the individual defendants lodge evidentiary objections related to third parties and former employees of Cemex: Mr. Gallop, Mr. Milano, and Mr. Jenkins.  Reply MSJ 1 at 7–9.  At the September 10, 2025, hearing, defendants confirmed that the depositions of Mr. Milano and Mr. Jenkins went forward.  I DENY the request to strike their declarations.  As to the issues raised with Mr. Gallop's declaration and deposition testimony, these are best reserved for a jury to determine Mr. Gallop's credibility.  I DENY the individual defendants' request to strike his declaration.  Any issues of foundation, speculation, and hearsay are better reserved for motions *in limine* or trial.  *See Doe v. Starbucks, Inc.*, No. 08-

United States District Court
Northern District of California

United States District Court
Northern District of California

**II.    Applicability of the Continuing Violation Doctrine**

The individual defendants argue that because California Government Code section 12960(e) requires that a complaint be failed within three years with the Civil Rights Department ("CRD"), any relief Mr. Sample seeks against the individual defendants must be related to alleged conduct postdating February 8, 2021.  MSJ 1 at 10 (explaining that Mr. Sample filed his CRD complaint on February 8, 2024); 4AC ¶ 9.  Mr. Sample contends that the continuing violation doctrine applies in this case because "Defendants' conduct before the statutory period was the same type of conduct that occurred on or after February 8, 2021 . . . ."  Oppo. MSJ 1 at 11.  This "ongoing pattern of harassment," he asserts, is enough to allow for consideration of all of the alleged actions since the onset of Mr. Sample's employment at Cemex.  *Id.*

The continuing violation doctrine "allows liability for unlawful employer conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period."  *Richards v. CH2M Hill, Inc.*, 26 Cal.4th 798, 802 (2001).  The California Supreme Court has held that

> an employer's series of unlawful actions in a case of failure to reasonably accommodate an employee's disability, or disability harassment should be viewed as a single, actionable course of conduct if (1) the actions are sufficiently similar in kind; (2) they occur with sufficient frequency; and (3) they have not acquired a degree of 'permanence' so that employees are on notice that further efforts at informal conciliation with the employer to obtain accommodation or end harassment would be futile.

*Id.*  Here, Mr. Sample alleges that he "faced derogatory comments such as being called the 'N-word', and 'retarded' by co-workers and supervisors throughout his employment at CEMEX."  Oppo. MSJ 1 at 11.  He contends that Mr. Hawkins made harassing comments starting in 2022.  Sample Decl. [Dkt. No. 142-2] ¶ 6.[5]  Other than that specific allegation, he asserts only that he faced "[o]ther racial and disability-based comments from co-workers, *and managers*," but does

---

CV-0582-AG, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).

[5] Mr. Sample also alleges that "[i]n 2021 . . . Defendant Kimberly Linton said, "Technically and as history reflects, maybe you are what you seem to be so offended by, and you just need to loosen up and go with it."  Sample Decl. [Dkt. No. 142-2] ¶ 6.  But he provides no specific date in 2021, so it is unclear whether this alleged comment was made prior to February 8, 2021.  I address the severity of this comment, or lack thereof, later.

not name individuals, nor does he provide a date or range of dates during which he experienced these negative and profane comments. *Id.* at ¶ 7 (emphasis added).

The problem with Mr. Sample's argument is that he does not offer any evidence that Mr. Hawkins, Ms. Pine, or Ms. Linton ever harassed him prior to February 8, 2021. There is sufficient testimony from Mr. Sample's own depositions (dating back to his experiences beginning in 2017 broadly), and those of former Cemex employees, Mr. Milano (dating back to at least 2017),[6] Milano Depo. [Dkt. No. 164-6] at 118–133, Mr. Gallop (dating back to 2018), Gallop Decl. Exh. 10 Oppo. MSJ 2 at ¶¶ 2–4, and Mr. Jenkins (dating back to his six months working for Cemex in 2020), Jenkins Depo. [Dkt. No. 164-6] at 19–20, 32–65, that the continuing violation doctrine can apply to defendant Cemex. But none of that evidence regards the individual defendants' conduct. There is simply no argument or evidence that any of their "actions [were] sufficiently similar in kind," "occur[ing] with sufficient frequency," or "acquired a degree of 'permanence'" that extended beyond the start of the statute of limitations period. *Richards*, 26 Cal.4th at 802.

### III.    Individual Defendants' Motion For Summary Judgment

To defeat summary judgment concerning Mr. Sample's harassment and hostile work environment claim against the individual defendants, Mr. Sample must demonstrate a dispute of material fact that "(1) []he is a member of a protected group; (2) []he was subjected to harassment because []he belonged to this group; and (3) the alleged harassment was so severe that it created a hostile work environment." *Lawler v. Montblanc North America, LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013) (citation omitted). Further, he "must show a concerted pattern of harassment of a repeated, routine or generalized nature." *Id.* (internal quotation marks and citation omitted).

---

[6] Mr. Milano worked for Cemex for 23 years, including long before Mr. Sample's employment commenced in 2017, but his knowledge as it pertains to the work environment to which Mr. Sample was exposed necessarily dates back to 2017.

United States District Court
Northern District of California

Finally, "[u]nlike discrimination claims, harassment consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management." *Id.* (internal quotation marks and citation omitted). There is no material dispute that the individual defendants' conduct, to the extent any of it is offensive, does not rise to the level of severe harassment necessary for liability.

### A. Joanna Pine and Kimberly Linton

In his Complaint and in opposition to the individual defendants' motion, Mr. Sample principally alleges that Ms. Pine and Ms. Linton's failure to investigate his complaints and contact with him during his 2024–2025 leaves of absence in a purported attempt to engage in the interactive process constitute harassment. 4AC ¶¶ 19, 28–35, 44–45; Oppo. MSJ 1 at 7–10. They do not. No reasonable jury could conclude that Human Resources director Ms. Pine's and Human Resources Business Partner Ms. Linton's alleged conduct was "so severe" or "of a repeated, routine or generalized nature" that it could constitute harassment.

Whether or not Ms. Pine and Ms. Linton knew of and failed to investigate Mr. Sample's claims is immaterial—they cannot be held liable for harassment because of that decision. "[I]ndividual supervisory employees should not be placed at risk of personal liability . . . for personnel management decisions which have been delegated to the supervisor by the employer, such as deciding whether to investigate or take action on a complaint of . . . harassment." *Fiol v. Doellstedt*, 50 Cal.App.4th 1318, 1327–28 (1996). That proposition is buttressed by the Ninth Circuit's long-held understanding that actions constituting harassment cannot be "of a type necessary to business and personnel management." *Lawler*, 704 F.3d at 1244 (citing *Reno v. Baird*, 18 Cal.4th 640, 646 (1998)). The California Supreme Court has explained that "commonly necessary personnel management actions" include those "such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions,

14

deciding who will and who will not attend meetings, deciding who will be laid off, and the like . . . ." *Baird*, 18 Cal.4th at 646–47.  Consistent with this precedent, the Hon. William H. Alsup held in a FEHA sexual harassment case, "No individual supervisor liability may be imposed . . . for mere failures to investigate, prevent or take remedial action against harassment." *Bellecci v. GTE Sprint Commc'ns Corp.*, No. 02-CV-03974-WHA, 2003 WL 151538, at \*4 (N.D. Cal. Jan. 14, 2003) (Alsup, J.) (citing *Fiol*, 50 Cal.App.4th at 1326).  "A nonharassing supervisor who fails to take action on a [harassment] complaint by a subordinate has not engaged in personal conduct constituting harassment, but rather has made a personnel management decision which in retrospect may be considered to be inadequate or improper." *Id.*

Mr. Sample repeatedly contends that while he was out on leave, "he received numerous text messages from Defendants regarding his return to work" and that these repeated texts constituted harassment.  Oppo. MSJ 1 at 8.  This alleged conduct cannot constitute harassment.  As Magistrate Judge Laurel Beeler held in a similar matter, "[i]f anything, the messages show [the individual defendants'] efforts to engage in the interactive process and provide reasonable accommodations.  No reasonable jury could find that the emails constitute harassment." *Mawari v. Constellis, LLC*, No. 23-CV-06029-LB, 2025 WL 1533009 at \*5 (N.D. Cal. May 29, 2025) (Beeler, M.J.).  I conclude that the same is true here.

Mr. Sample alleges that Ms. Linton made one or two comments towards him that amount to at least a dispute of fact on the level of severity and the pervasiveness of the conduct.  With only two alleged comments, Mr. Sample must show there is a dispute whether those comments alone were "extremely severe." *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 648 (9th Cir. 2021) (explaining that "when severity is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment" (internal quotation marks and citation omitted)).  Neither is.

In his Complaint and declaration, Mr. Sample alleges that Ms. Linton stated:

15

United States District Court
Northern District of California

- "Technically and as history reflects, maybe you are what you seem to be so offended by, and you just need to loosen up and go with it."

4AC ¶ 40; Sample Decl. [Dkt. No. 142-2] ¶ 6.  However, when asked about Ms. Linton's offensive comments at his deposition, Mr. Sample responded only with the comment I discuss below.  This inconsistency casts doubt on whether the one quoted above occurred: Ms. Linton of course denies it.  The other comment, to which Mr. Sample testified for the first time at his deposition, was:

- "Oh you came back again? . . . Ain't you tired? We . . . we done fired you plenty of times.  Ninja, why you here?"

Sample Depo. [Dkt. No. 131-1] at 67: 19-22.

Although there is a dispute whether Ms. Linton, who is not Black, made those comments in the first instance, MSJ 1 at 16, there is no doubt that the comments do not rise to a level of severity and were of such a routine nature to constitute individual harassment.  These comments, considered together or separately, are legally insufficient to sustain Mr. Sample's claim against Ms. Linton.  *See, e.g.*, *Fried*, 18 F.4th at 649 ("The comments here fall far short of that mark. Indeed, we have deemed much harsher comments and actions insufficient to create a hostile work environment.") (collecting cases); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 643 (9th Cir. 2003) (same); *c.f. Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir. 2001) (holding that a "relentless campaign of insults, name-calling, vulgarities, and taunts . . . by male co-workers and supervisors at least once a week and often several times a day" constituted harassment necessary to produce an abusive work environment).

At the second hearing on the motions for summary judgment, counsel for Mr. Sample appeared to concede that Mr. Sample could not meet his burden to demonstrate a dispute of material fact that Ms. Pine and Ms. Linton are individually liable for harassment.  I likewise

16

conclude that these claims cannot survive summary judgment.

### B. Demetrius Hawkins

Mr. Sample's harassment claim against Mr. Hawkins fails for similar reasons. Several alleged comments are at issue, but none explicitly refers to Mr. Sample's race or disability other than the ones cited below. *See Patterson v. Boeing Co.*, No. 16-CV-07613-GW, 2018 WL 5937911, at *24 (C.D. Cal. Apr. 4, 2018) ("the lack of any facially race-based conduct directly involving Plaintiff makes it much more difficult for him to establish any showing of a severe or pervasive hostile work environment for purposes of his harassment claim based on his race.").

The two alleged comments raised by Mr. Sample in his Opposition are:

- None of your co-workers like you, but there are two of them I know for a fact that hates [sic] you and has turned most of them against you. You're not getting the transfer and just so you know, I don't like you either, now get out of here and do your job. Oppo. MSJ 1 at 3.

- There is no race discrimination directed at me, so you must be the problem. *Id.*

A final alleged comment by Mr. Hawkins was raised by the individual defendants in their motion. *See* MSJ 1 at 17 ("Dave and Jim don't like you . . . Two drivers don't like you here . . . I don't like you either . . . . So what if they call you the N-word? I mean don't care. They call me the same thing.").

Those comments may belittle or make light of Mr. Sample's ongoing situation, but they do not rise to the level of severity or pervasiveness required to sustain a FEHA harassment claim. In opposition to the motion regarding Mr. Hawkins, Mr. Sample references only general allegations of harassment and discrimination not attributable to any of the individual defendants, *see* Oppo. MSJ 1 at 6, and that other employees witnessed Mr. Hawkins use the "N-word" at work. Oppo. MSJ 1 at 10. The latter does not constitute an allegation of harassment directed

United States District Court
Northern District of California

towards Mr. Sample, nor does Mr. Sample assert that it is in his complaint, his depositions, or anywhere except his opposition to the pending motion. These allegations may be relevant to Mr. Sample's FEHA and Title VII hostile work environment claim against Cemex, but not do not constitute severe harassment by Ms. Linton, Ms. Pine, or Mr. Hawkins as individuals.[7]

### IV.    Cemex's Motion For Summary Judgment

#### A.  After Acquired Evidence

Akin to the hostile work environment-related claims, the majority of Mr. Sample's claims against Cemex hinge on the determination of whether he was discriminated against because of his race or his disability. This discrimination, Mr. Sample contends, took many forms. A central one is that his employment with Cemex was terminated because of his race and/or disability. Before addressing this, I must consider the impact of after-acquired evidence. Defendants learned during discovery that Mr. Sample did not disclose his disabilities and medical condition to the medical examiner who certified him for his job. Because that certification was a job requirement, Mr. Sample was ineligible for employment as a ready-mix driver and Cemex had to terminate him.

It is undisputed that it is mandatory for ready-mix drivers to have a valid federal DOT medical certification to be qualified as drivers. MSJ 2 at 7; Sample Depo. MSJ 2 [Dkt. No. 124] at 66:16-22. It is also undisputed that during his time working for Cemex, Mr. Sample went to DOT physicals to receive a certification by a medical examiner in December 2022 and in May 2024. Sample Depo. MSJ 2 [Dkt. No. 124] at 128:2–136:12; 138:14–141:9. Mr. Sample also attended a DOT certification exam in May 2025. Sample Decl. Exh. 48 [Dkt. No. 141-5] at 62–66. Cemex learned during the course of discovery that in each of the DOT certification forms that he provided to the medical examiner, Mr. Sample marked "no" for the categories of "anxiety,

---

[7] In Opposition to the individual defendants' motion, Mr. Sample raises the issue of punitive damages. Because I am granting summary judgment to the individual defendants, Mr. Sample is not entitled to punitive damages against them.

United States District Court
Northern District of California

United States District Court
Northern District of California

depression, nervousness, other mental health problems," or "brain injuries or illnesses." Sample Depo. MSJ 2 [Dkt. No. 124] at 134:2–135:21, 138:14–139:10. And, although Mr. Sample admitted that he "started having anxiety problems when [he] started having problems with Cemex," and acknowledges that he was receiving treatment for anxiety and depression at the time he was filling out those forms, he contends that he marked "no" on the DOT certification forms because he "was in denial" about his condition. Sample Depo. MSJ 2 [Dkt. No. 124] at 139:22–140:9. He admitted that he only "realized . . . later" that he was getting treatment from a health care professional who certified he was eligible for disability benefits due to his anxiety and depression. *Id.* at 141:2-9.

When asked about these inconsistences at the second hearing on the motions for summary judgment, counsel for Mr. Sample urged me to review the deposition testimony of DOT medical examiner Dr. Daryl Berman. In counsel's view, Dr. Berman testified that because Mr. Sample was not on any medication, he was therefore cleared to be a ready-mix driver. But the deposition requires a far less charitable understanding. Dr. Berman confirmed that Mr. Sample never informed him of any mental-health-related concerns, and that while Dr. Berman was aware of Mr. Sample's heart attack he never knew about Mr. Sample's ongoing mental health issues because "[Mr. Sample] didn't check that on this [DOT Certification form] list." Berman Depo. MSJ 2 [Dkt. No. 126] at 126. When asked if this type of information should be relayed to make an appropriate DOT conclusion, Dr. Berman responded: "Well, if [Mr. Sample is] taking medication and he's being treated, he should have told me, yes." *Id.* at 127:24-25. He further confirmed that a mental-health-related leave "could have required a letter from whoever was treating him for the mental-health issue." *Id.* at 128:6-8. Later, when asked, "[g]enerally when DOT certificates are being issued, they need to be issued based on accurate information; is that correct?" Dr. Berman responded: "Yes." *Id.* at 133:15-18.

In considering the after-acquired evidence doctrine in the employment context, the

19

Supreme Court has held: "It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995). Further, "[w]here an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362–63. Cemex has demonstrated that it has learned of a legitimate reason that it would have terminated Mr. Sample from his position. As a result, there is no path for Mr. Sample to succeed on any of his claims related to his termination.[8]

Cemex requires each of its ready-mix drivers to have a valid DOT certification and that Dr. Berman was not informed of Mr. Sample's admitted mental-health issues prior to issuing a certification for Mr. Sample's fitness as a ready-mix driver, rendering the certification invalid. Given the after-acquired evidence, Cemex was entitled to terminate Mr. Sample because of a lack of valid DOT certification. No discrimination claim, retaliation claim, or wrongful termination claim[9] related to Mr. Sample's termination can survive because of this requirement. Nor can Mr. Sample's failure to accommodate or engage in the interactive process claim survive because Cemex would have been justified in terminating Mr. Sample's employment before any need to accommodate or engage in the interactive process after his leaves of absence. Cemex's motion for summary judgment is GRANTED IN PART in so far as Mr. Sample's claims depend on his

---

[8] As explained above, Cemex also points to Mr. Sample's submission of numerous leave of absence slips to show that he was unable to perform his job.

[9] At the second hearing on the motions for summary judgment, counsel for Mr. Sample argued that if there is any dispute whether Cemex is liable for Mr. Sample's harassment at work, there must also be a dispute as to whether he was wrongfully terminated and retaliated against for filing multiple complaints. That is not so—the claims are independent. Mr. Sample was lawfully terminated in light of the after-acquired evidence. That does not mean that Cemex is not responsible if he was harassed or discriminated against while on the job, but it does insulate the termination.

20

termination as an unlawful action.[10]

### B. Remaining Claims

The crux of Mr. Sample's remaining claims is his harassment and hostile work environment claim, which is disputed. The other discrimination claims are variants of that claim, and it is unclear to me that Mr. Sample would be entitled to different relief if he prevails only on harassment and hostile work environment or all of the remaining claims. The parties should clarify this question in their Pretrial Conference Statement. I discuss each of the remaining claims below.

### 1. Claim Five for Harassment and Hostile Work Environment in violation of FEHA and Title VII against Cemex[11]

This is the heart of Mr. Sample's case as I view it. FEHA states in relevant part: "It shall be an unlawful employment practice . . . for an employer, because of [a protected class] to harass an employee . . . . Harassment of an employee . . . by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." Cal. Gov. Code. § 12940. To show Cemex was in violation of FEHA, Mr. Sample must demonstrate that (1) he was being harassed because of his race and/or disability; and that (2) Cemex "kn[e]w or should have known" about the harassment but (3) fail[ed] to take immediate and appropriate corrective action. *Id.* To "establish a prima facie hostile work environment claim under either

---

[10] A brief comment about one of these now-adjudicated causes of action. Mr. Sample's third cause of action is for Failure to Accommodate in violation of FEHA and ADA. 4AC ¶¶ 70–82. I note that even absent the after-acquired evidence, I would conclude that summary judgment should be granted on this claim as well. Mr. Sample failed to engage in the interactive process in 2024 when he refused to respond to Cemex's many requests for information while he was on leave. He argues that he was on disability leave with a return date. His argument presupposes that he did not need an accommodation when he returned to work, since he refused to communicate about any accommodation. Either way, this claim lacks merit.

[11] In his Complaint, Mr. Sample additionally alleges this cause of action against Cemex in violation of 42 U.S.C. § 1981, which I address separately alongside his ninth cause of action.

United States District Court
Northern District of California

Title VII or FEHA, a plaintiff must show that he was subjected to verbal or physical conduct because of [a protected characteristic], that the conduct was unwelcome, and that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's work environment and create an abusive work environment." *Holmes v. Tenderloin Housing Clinic, Inc.*, 772 F.Supp.2d 1074, 1093 (N.D. Cal. 2011) (Hamilton, J.).  Mr. Sample has met his burden that there is a dispute of material fact for each element.

As the Factual Background at 2:15–3:05 of this Order makes clear, Mr. Sample has raised a genuine dispute of fact about whether his coworkers harassed him because of his race and disability.  Given Mr. Sample's asserted rationale for requiring leaves of absences due to stress-related issues stemming from the harassment at work, the alleged harassment never stopped. And, Mr. Sample has also presented evidence that Cemex failed to investigate the issues of harassment, including union grievances that Mr. Sample contends Cemex was made aware, an email from Mr. Hawkins regarding Mr. Sample's harassment, and Mr. Milano's testimony that he filed a complaint to Cemex on Mr. Sample's behalf that was never investigated, adding to the pervasiveness of the alleged conduct.  *See* Sample Decl. [Dkt. No. 141-2] at ¶ 41; Milano Decl. [Dkt. No. 141-3] at ¶ 5.

Cemex largely does not dispute that Mr. Sample faced these harassing comments at work. Instead, it argues that (1) claims against HR representatives are barred, (2) Mr. Sample's allegations are untimely under California Government Code section 12960(e); and that (3) Mr. Sample failed to take advantage of Cemex's complaint hotline to report any harassment and so therefore he "never gave [Cemex] the opportunity to investigate, address and prevent the alleged conduct he now claims existed at the local level." MSJ 2 at 27.  I have granted the individual defendants summary judgment and concluded that the continuing violation doctrine may apply to the claims against Cemex but not the individuals.  As for the failure to report harassment, while there is no dispute that Mr. Sample did not make use of the hotline, there remains a dispute

22

United States District Court
Northern District of California

whether Cemex "kn[e]w or should have known" that the alleged actions of Mr. Sample's coworkers were happening. Cal. Gov. Code. § 12940; *See* Sample Decl. [Dkt. No. 141-2] at ¶ 41; Milano Decl. [Dkt. No. 141-3] at ¶ 5. A reasonable jury may find that Mr. Sample was harassed at work and that Cemex had at least constructive notice of Mr. Sample's harassment, if not actual notice because of the grievances, Mr. Sample's communications with Mr. Hawkins, and the report filed by another Cemex employee.

For those reasons, Mr. Sample's fifth cause of action against Cemex for harassment and hostile work environment in violation of FEHA and Title VII survive.

### 2.    Claim Eight for Failure to Prevent Discrimination and Harassment in Violation of FEHA

The parties do not dispute that Mr. Sample's eighth cause of action for failure to prevent discrimination and harassment rises and falls with Claim 5. MSJ 2 at 26; Oppo. MSJ 2 at 24. I agree. Indeed, it is unclear to me that Claim 8 is different from Claim 5. The language of FEHA states unequivocally that an employer may be held liable for non-supervisory employee harassment only when it "knows or should have known of this conduct and fails to take immediate and appropriate corrective action." Cal. Gov. Code. § 12940. I DENY Cemex's motion on this cause of action but will ask at the Pretrial Conference why this claim is necessary.

### 3.    Claim One for Race Discrimination in violation of FEHA and Title VII

When determining summary judgment on discrimination claims under Title VII, FEHA, or Section 1981, courts use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) (Title VII and Section 1981 claims), *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 354 (2000) (FEHA claims). The *McDonnell Douglas* framework first requires a plaintiff to establish a prima facie case of discrimination before the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment decision. Finally, if an

23

employer meets that burden, the plaintiff must raise "a triable issue of material fact as to whether the defendant's proffered reasons for its actions are a mere pretext for unlawful discrimination." *Holmes*, 772 F.Supp.2d at 1090.

The Ninth Circuit has "emphasized that the requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Coghlan v. American Seafoods Co. LLC.*, 413 F.3d 1090, 1094 (9th Cir. 2005) (internal quotation marks and citations omitted).  *See Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002) (explaining that to establish a prima facie case even "an employee's own statement that he was performing at a level equal to that of other employees" can meet this "minimal" burden).  For Mr. Sample to defeat summary judgment on his first cause of action, he must first make out a prima facie case by generally showing he "(1) was a member of a protected class; (2) was qualified for the position sought or was performing competently in the position already held; (3) suffered an adverse employment action, such as termination, demotion, or denial of an available job; and [that] (4) some other circumstance suggests discriminatory motive."  *Brown v. Los Angeles Unified School Dist.*, 60 Cal.App.5th 1092, 1105 (2021); *see also Coghlan*, 413 F.3d at 1094.

There is no dispute that Mr. Sample, an African American man, is a member of a protected class.  He has made a showing that he was "competently" performing the job he had been hired for.  *Brown*, 60 Cal.App.5th at 1105.  While Cemex contends that Mr. Sample's December 2019 and March 2022 accidents and incidents are evidence that he was not competent in his position, Mr. Sample views his ultimate re-instatement following union grievances as evidence that he *was* performing competently.  Further, Cemex argues that Mr. Sample's repeated and ongoing leaves of absence resulted in an "indefinite leave of absence" and demonstrate Mr. Sample's lack of competence absent an unreasonable accommodation.  MSJ 2 at 21–22; *see id.* at 22 n. 20 (citing *Lawler v. Montblanc North America, LLC*, 704 F.3d 1235,

24

1242–43 (9th Cir. 2013) ("employee's termination upheld, where employee's requests for reduced hours and 5-month leave of absence were denied, as she was unable to competently perform her duties with or without reasonable accommodation . . . ."). Mr. Sample, on the other hand, asserts that his requests for leaves of absence flowed directly from his daily experience working in a hostile work environment. Oppo. MSJ 2 at 10–13.

The central issue is whether Mr. Sample has made out a prima facie showing for the third prong of a discrimination claim, which requires that there be some "adverse employment action." *Brown*, 60 Cal. App. 5th at 1105. The California Supreme Court has explained that determining what constitutes an adverse employment action "is not, by its nature, susceptible to a mathematically precise test," and that "the significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and the employee." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1054 (2005). The *Yanowitz* court drew heavily from the Supreme Court's decision in *Harris v. Forklift Systems Incorporated*, where the Court stated:

> the statutory language protecting employees against . . . discrimination in compensation or in the terms, conditions, or privileges of employment is not limited to adverse employment actions that impose an economic detriment or inflict a tangible psychological injury upon an employee. . . . When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.

*Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted).

Mr. Sample has presented adequate evidence that he faced this type of racial workplace discrimination in violation of Title VII. He claims that co-workers and even that his manager Mr. Hawkins referred to him using the "N-word" and that coworkers used other racially derogatory terms when speaking to him, including "jungle bunny," "catfish," and "monkey." Sample Decl. [Dkt. No. 141-2] at ¶ 13. A picture of a noose was posted in the break room. This is sufficient for a showing that he was subject to racially-charged workplace discrimination. Sample Depo.

25

Case 3:23-cv-00428-WHO   Document 175   Filed 01/16/26   Page 26 of 31

[Dkt. No. 124] at 168.

The FEHA requires more.  The California Supreme Court has held:

Because the FEHA treats harassment in a separate provision, there is no reason to construe the FEHA's prohibition against discrimination broadly to include harassment.  Hence, our case law makes clear that the FEHA's discrimination provision addresses only *explicit* changes in the 'terms, conditions, or privileges of employment;' that is, changes involving some *official action taken by the employer*.  In the case of an institutional or corporate employer, the *institution or corporation itself* must have taken some official action with respect to the employee, such as hiring, firing, failing to promote, adverse job assignment, significant change in compensation or benefits, or official disciplinary action.

*Roby v. McKesson Corp.*, 47 Cal.4th 686, 706 (2009) (emphasis in original).  Mr. Sample cannot establish a prima facie FEHA case relying on the disputed harassment factual allegations.  He is likewise precluded from relying on Cemex's 2025 termination in light of the after-acquired evidence.  However, to sustain both his FEHA and Title VII discrimination claims, Mr. Sample can at a minimum point to Cemex's previous attempts to terminate him in 2019 (under the continuing violation doctrine) and 2022 as official actions, which Mr. Sample appealed and won.

The final prong of a race discrimination claim requires that Mr. Sample show that "some other circumstance suggests discriminatory motive." *Brown*, 60 Cal. App. 5th at 1105.  Here, Mr. Sample raises the ongoing harassing conduct and Cemex's alleged refusal to investigate his complaints.  Oppo MSJ 2 at 16–17.  That successfully fills out his prima facie case for discrimination under Title VII and FEHA.

Pursuant to the *McDonnell Douglas* framework, I next consider whether Cemex has offered "a legitimate, nondiscriminatory reason for the adverse employment decision[s]." *Holmes*, 772 F.Supp.2d at 1090.  I must ask only whether Cemex "honestly believed its reasons for its actions, even if its reason is foolish or trivial or even baseless." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002).  Cemex has met its burden as far as the 2019 and

26

2022 terminations are concerned.[12]  Cemex reasonably argues that Mr. Sample's "repeated violations of procedures and safety rules constituted a pattern of unsafe and unsatisfactory performance that [Cemex] had to address."  MSJ 2 at 18.  These are not "foolish or trivial" reasons for a company to decide to terminate an employee, at least facially.  And, Cemex has presented adequate evidence to suggest that it "honestly believed its reasons" for terminating Mr. Sample in 2019 and 2022.  *Villiarimo*, 281 F.3d at 1063.

Despite Cemex meeting its burden, I ultimately conclude that Mr. Sample has raised a triable issue of material fact whether Cemex's "proffered reasons for [its actions] are mere pretext for unlawful discrimination."  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010).  Mr. Sample "may establish pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Morgan v. Regents of University of California*, 88 Cal. App. 4th 52, 68 (2000).  "With direct evidence of pretext, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.  The plaintiff is required to produce very little direct evidence of the employer's discriminatory intent to move past summary judgment."  *Id.* at 69.

Mr. Sample has shown at least some direct evidence of Cemex's discriminatory intent.  In the context of his 2019 termination, and especially in light of the alleged ongoing harassment, Cemex's decision to terminate Mr. Sample and subsequently place him on an extended period of suspension without pay instead of following its own stated policies concerning disciplinary action serve as direct evidence of discriminatory intent.  2019 Termination [Dkt. No. 141-3] at 115, 121;

---

[12] Although Cemex offers non-discriminatory explanations about Mr. Sample's terminations, it does not offer any non-discriminatory explanation on why such an alleged hostile workplace was allowed to proliferate in violation of Title VII's harassment-as-discrimination claim, *see Harris*, 510 U.S. at 21, other than it was unaware of it, which will be a jury question.  This aspect of Mr. Sample's claim therefore necessarily goes forward.

United States District Court
Northern District of California

Cemex Policies [Dkt. No. 141-3] at 119.  As for Mr. Sample's 2022 termination, again considering the ongoing alleged hostile work environment, Mr. Hawkins' determination of fault absent access to the police report may serve as evidence of discriminatory intent.  Hawkins Depo. [Dkt. No. 141-4] at 37–38.  Mr. Sample's successful appeal of both terminations, in one appeal imploring the company to "discipline all driver [sic] fairly" supports his claim of discriminatory intent.  Appeal of 2019 Termination [Dkt. No. 141-3] at 124.

For those reasons, Mr. Sample has presented disputes of material fact concerning his first cause of action for race discrimination.

### 4. Claim Two for Disability Discrimination in violation of FEHA and ADA

To establish a prima facie disability claim, Mr. Sample must make an adequate showing that he "(1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations; and (3) was subjected to an adverse employment action because of the disability or perceived disability." *Sandell v. Taylor-Listug, Inc.*, 188 Cal. App. 4th 297, 310 (2010).  Mr. Sample's second cause of action for disability discrimination in violation of FEHA may proceed for almost exactly the same reasons I just described for his race discrimination claim.[13]

The main difference from Mr. Sample's race discrimination claim is the first prong.  There is no doubt that Mr. Sample both suffers from a disability and was regarded as such in the workplace.  *Id.*  As to the second prong, Mr. Sample has offered evidence that he "could perform the essential duties of the job with or without reasonable accommodations," with the only accommodations at issue in this case being the requested leaves of absence.  *Id.*  Finally, Mr.

---

[13] Nowhere in his opposition for either motion does Mr. Sample reference, refer to, or defend Cemex's challenges to the Americans with Disabilities Act aspect of this claim.  To that end, summary judgment is GRANTED to Cemex on Mr. Sample's second cause of action for disability discrimination in violation of the ADA.

Sample's evidence that he was subject to an adverse employment action via his 2019 and 2022 terminations applies to this cause of action too.

I conclude that Mr. Sample raises triable issues of material fact for this cause of action in spite of Cemex's showing it "honestly believed its reasons for its actions." *Villiarimo*, 281 F.3d at 1063. Mr. Sample's testimony (and other former co-worker testimony) concerning the vile and incessant name calling and treatment he endured as related to his disabilities adds to the viability of this cause of action. Sample Decl. [Dkt. No. 141-2] at ¶ 13.

### 5.    Claim Nine for violation of 42 U.S.C. § 1981

Likewise, Mr. Sample's ninth cause of action rises and falls alongside his previous surviving claims. 42 U.S.C. § 1981 "guarantees 'all persons' the right to 'make and enforce contracts.' This right includes the right to the 'enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship,' including the relationship between employer and employee." *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1112 (9th Cir. 2008). Section 1981 "creates a cause of action only for those discriminated against on account of their race or ethnicity." *Id.* at 1123. Similar to the court's posture in *Johnson*, Sample "contends that [Cemex] [was] aware of the harassment he faced from his co-workers and failed to take steps to address it, thereby creating a hostile work environment. In this circuit, such claims are cognizable under § 1981." *Id.* at 1112. Therefore, for all the reasons that Mr. Sample defeats summary judgment on his discrimination and harassment/hostile workplace causes of action, he defeats summary judgment for his Section 1981 cause of action.

### 6.    Punitive Damages

California Civil Code section 3294 provides that in "an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

Cal. Civ. Code § 3294(a). Section 3294 further explains that "[w]ith respect to a corporate employer the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." *Id.* at § 3294(b). The California Supreme Court has explained that "the Legislature intended that principal liability for punitive damages not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal.4th 563, 576–77 (1999). The Court also noted that "supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents," and that such a determination is a question of fact. *Id.* at 567, 577. So here.

I will leave this issue for trial and DENY Cemex's motion. It is unclear to what extent, if any, an "officer, director, or managing agent of the corporation" had advance knowledge and conscious disregard for the treatment of Mr. Sample. But if the harassing conduct was as widespread and serious as Mr. Sample contends, he will be allowed to show that a responsible Cemex official was aware of it and condoned it. *See* Pine Depo. Exh. 19 Oppo. MSJ 2 [Dkt. No. 141-3] at 136 (estimating that she oversees 1,200 employees in Northern California); Pine Decl. [Dkt. No. 127] at ¶ 15 ("As part of my regular and customary job responsibilities in my current position as HR Director and in my prior position as HR Business Partner for [Cemex], I regularly review notes submitted by employees for leaves of absence and oversee the handling of requests from employees and their health care providers for work restrictions, work limitations, accommodations for medical conditions and medical leaves of absence, including for Mr. Sample.").

## CONCLUSION

The individual defendants' motion for summary judgment is **GRANTED** in full.

Cemex's motion for summary judgment is **GRANTED IN PART** regarding Causes of Action 3, 4, 6, 7 and 10.  Material disputes exist for Causes of Action 1, 2, 5, 8, and 9 and Cemex's motion is DENIED concerning them.

      **IT IS SO ORDERED.**

Dated: January 16, 2026



William H. Orrick
United States District Judge

United States District Court
Northern District of California

31